UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 17, 2017

------------------------------------------------------------------ X
                     :

ROSA M. INFANZON,             :
                     :
             Plaintiff,      :        15-cv-6826 (KBF)
                     :
          -v-             :       OPINION & ORDER
                     :

NANCY BERRYHILL, Acting Commissioner of   :
Social Security,                :
                     :
            Defendant.     :
                     :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Plaintiff Rosa Infanzon seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner"), finding that she was not disabled and not entitled to Social Security Disability ("SSD") benefits under Title II or Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). Plaintiff filed for disability benefits based on low back pain, arthritis in her hands, asthma, knee pain, depression, and branchial neuritis (shoulder inflammation). Now before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons set forth below, defendant's motion is GRANTED and plaintiff's motion is DENIED.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

### A.    Procedural Background

Plaintiff applied for SSD benefits on June 27, 2012, and applied for SSI on June 28, 2012. (Tr. 223-35, 237.) The Social Security Administration ("SSA") denied her claims. (Tr. 139-44.) Plaintiff then requested a hearing before an

administrative law judge ("ALJ"), which was held on December 11, 2013, and June 23, 2014. (Tr. 48-97, 897-929.) The ALJ, before whom plaintiff and her attorney appeared, considered the case de novo. On September 5, 2014, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 30-43.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 3, 2015. (Tr. 1-7.)

B.    Factual Background

The Court recites only those facts relevant to its review here. A more thorough summary of plaintiff's medical history can be found in the parties' briefing and in the extensive administrative record.

1.    Plaintiff's Personal History

Plaintiff was born in May 1963. (Tr. 251.) She attended two years of college and enrolled in the military at age twenty-one. (Tr. 246, 635.) She was in the National Guard for eleven years. (Tr. 635.) Subsequently, from 2000 to 2012, plaintiff worked as a helper for an electrical company as well as a security guard. (Tr. 246.) Plaintiff was fired from her job as an electrical helper on June 4, 2012, after she was involved in a car accident in her employer's car and was arrested for driving while intoxicated. (Tr. 901-04.) Plaintiff claims that as of June 4, 2012, she could no longer work at any job because she was disabled. (Tr. 912.)

2.    Plaintiff's Medical History

a.    Plaintiff's physical impairments

During the relevant time period, plaintiff received treatment from Montefiore Medical Group. On June 18 and July 18, 2012, plaintiff saw Dr. Maria Diaz of

Montefiore Medical Group for, <u>inter alia</u>, back pain, knee pain, shoulder pain, and asthma. (Tr. 619-23, 637-39.) Dr. Diaz referred plaintiff to an orthopedist for her knee pain. (Tr. 323.) Dr. Diaz reported that plaintiff was depressed from losing her job and that plaintiff smoked cigarettes daily. (Tr. 620, 637.) By November 13, 2012, Dr. Diaz observed that plaintiff's lungs were clear and that her asthma had improved. (Tr. 614.)

Plaintiff saw Dr. David Gonzalez of Montefiore Department of Orthopedic Surgery on August 7, 2012, for left knee pain. (Tr. 477.) Plaintiff reported that she was arrested on May 31 and twisted her knee in the process. (<u>Id.</u>) On examination, plaintiff's hips had normal motion without pain; both knees revealed no effusion but had tenderness at the lateral joint line. (Tr. 478.) Dr. Gonzalez assessed a possible left anterior cruciate ligament ("ACL") tear with a torn lateral meniscus and ordered a magnetic resonance imaging ("MRI"). (Tr. 479.) On August 7, 2012, a left knee x-ray was normal. (Tr. 521.) A left knee MRI, taken on August 20, 2012, revealed no meniscus tear, no cartilage defects, partial thickness tear of the ACL, and small joint effusion. (Tr. 346, 351.) On August 28, 2012, plaintiff reported to Dr. Gonzalez that her knee felt a bit better, and Dr. Gonzalez recommended that plaintiff begin physical therapy. (Tr. 476.)

On September 13, 2012, plaintiff complained to Dr. Gonzalez of back pain and left arm weakness. (Tr. 626.) An examination revealed low back and left shoulder tenderness and limited range of motion of the left shoulder. (Tr. 627.) Dr. Diaz recommended shoulder exercises, use of heat or ice, and medication. (Tr. 628.)

On October 9, 2012, Dr. Gonzalez wrote a prescription for plaintiff to participate in physical therapy for left shoulder tendonitis.  (Tr. 348.)

Plaintiff saw Dr. Gonzalez on October 9, 2012, for complaints of left shoulder and left knee pain, both of which plaintiff stated she had had since 2009.  (Tr. 473.) Plaintiff reported that her ability to walk, although associated with some pain, was not limited, and that her left shoulder pain was exacerbated by overhead activities. (Tr. 473.)  On examination, plaintiff was in no acute distress; she ambulated without assistance and had a normal tandem gait.  (Tr. 474.)  Her cervical spine had a good range of motion without discomfort.  (Tr. 474.)  Plaintiff's left shoulder had crepitus (crackling sound), discomfort with rotation, and a positive impingement sign, but the rotator cuff strength was intact.  (Tr. 474-75.)  Plaintiff's left knee had a good range of motion without discomfort and negative results of tests used to diagnose ACL injury.  (Tr. 475.)  Dr. Gonzalez administered a steroid injection to plaintiff's left shoulder for rotator cuff tendinitis and advised plaintiff to continue physical therapy for her left knee.  (Tr. 475.)

Plaintiff saw Dr. Adam Wollowick of Montefiore's Department of Orthopedic Surgery on October 31, 2012, for low back pain.  (Tr. 470.)  Plaintiff reported that she had the back pain for three years, the pain had been stable and intermittent, and it was alleviated with sitting and leaning forward.  (Tr. 470.)  Plaintiff further reported that she could only walk for 15-30 minutes.  (Id.)  On examination, plaintiff was well-oriented, well-coordinated, and in no acute distress, and had a normal gait and could toe/heel walk.  (Tr. 471.)  She had a normal range of motion of the lumbar

spine, and normal strength, sensation, and reflexes in her lower extremities. (Id.)
Straight leg raise ("SLR") testing was negative bilaterally, and range of hip motion
was normal. (Tr. 471.) Plaintiff was neurologically intact. (Tr. 472.) Dr. Wollowick
stated that he was concerned about stenosis and/or a herniated disc, and requested
authorization for an MRI of the lumbar spine. (Id.) He explained that once the MRI
was completed, an appropriate treatment plan would be determined. (Id.)

A November 6, 2012, lumbar spine MRI revealed no significant abnormalities
at L5-S1 or L1-L2,[1] disc bulges at T12-L1, L2-3, and L3-4 without significant
stenosis (narrowing), and a disc bulge at L4-5 with moderate increase in bulk,
central canal narrowing, and bilateral neural foraminal stenosis. (Tr. 352, 468.)
Dr. Wollowick interpreted the MRI as showing moderate central and bilateral
foraminal stenosis (narrowing of disc space) and degenerative disc disease at L4-5
and that the remaining levels were within normal limits. (Tr. 468.) On November
21, 2012, Dr. Wollowick diagnosed plaintiff with spinal stenosis and recommended
an epidural steroid injection. (Tr. 468.)

Plaintiff received treatment on December 6, 2012, from Dr. Boleslav
Kosharskyy of Montefiore Pain Center for low back pain and left knee weakness.
(Tr. 462-63.) On examination, plaintiff was in no acute distress. (Tr. 464.) She had
positive SLR tests bilaterally, a limited range of motion of the lumbar spine, and
essentially normal strength testing. (Tr. 464-65.) Dr. Kosharskyy recommended
epidural steroid injections at L5, which plaintiff had administered on January 7,

---

[1] These represent the 5 moveable vertebrae of the lumbar spine.

2013.[2]  (Tr. 460, 465, 499-505.)  At a January 28, 2013, follow-up plaintiff complained of continuing pain.  (Tr. 477.)  At the same follow-up, Dr. Kosharskyy observed that plaintiff's SLR test was negative bilaterally and that she had tenderness to palpation of the lumbar spine, no acute distress, no tenderness to palpation of the lower extremities, an antalgic gait, and normal toe/heel walking.  (Tr. 450-51.)  Plaintiff denied joint pain, muscle weakness, shoulder pain, limited range of shoulder motion, or hand or wrist pain.  (Tr. 449.)  Dr. Kosharskyy recommended that plaintiff consider visiting an orthopedic surgeon for a surgical opinion.  (Tr. 451.)  Plaintiff received another epidural injection on February 11, 2013.  (Tr. 480.)

Thereafter, plaintiff received treatment from a nurse practitioner at Montefiore Pain Center on March 15, 2013.  (Tr. 440.)  Plaintiff reported significant pain relief from the steroid injections and that she only experienced occasional mild pain with exertion.  (Tr. 440, 442.)  Plaintiff explained that her pain is adequately controlled with medication and denied having any medication side effects.  (Tr. 440.)  Aside from diffuse lumbosacral tenderness and mild spasm at L4/5, an examination was normal and showed a negative SLR test.  (Tr. 444.)

Dr. Kosharskyy examined plaintiff again on May 24, 2013.  (Tr. 436.)  Plaintiff was well-oriented, well-coordinated, and in no acute distress; she walked with a slow, slightly antalgic gait and was able to toe/heel walk.  (Tr. 436-37.)  Plaintiff had a normal range of lumbar spinal motion, normal lower extremity

_____

[2] Plaintiff noted that the epidural helped her pain somewhat.  (Tr. 453.)

strength, and normal sensation and reflexes in both legs. (Tr. 437.) SLR testing was positive on the left, and range of hip motion was normal and painless bilaterally. (Tr. 437.) Dr. Kosharskyy noted that steroid injections were very helpful in the past and scheduled additional injections. (Tr. 437.)

On September 26, 2013, plaintiff told Dr. Diaz that her back pain was better controlled. (Tr. 562.) On October 30, 2013, Dr. Diaz observed that plaintiff's lungs were clear, with no rhonchi or wheezing and that plaintiff's asthma had improved. (Tr. 556-57.)

### b. Plaintiff's psychiatric impairments

During a June 18, 2012 visit with Dr. Diaz for her physical impairments, plaintiff reported feeling "very depressed" as a result of losing her job on June 4, 2012. (Tr. 637; see also Tr. 622.) After a referral by Dr. Diaz, plaintiff met with social workers at Montefiore on several occasions from August 2012 through April 2013. (See Tr. 587, 589, 603, 639, 731.) Records from one such visit on January 13, 2013 note that plaintiff appeared calm and communicative and that she was feeling much better. (Tr. 587; see also Tr. 589 (similar note on April 2, 2013).)

Plaintiff began treatment at Fordham-Tremont Community Mental Health Center ("FTMHC") with psychiatrist Dr. Luis Ang in April 2013. (Tr. 408.) An initial mental status examination found plaintiff to be alert, oriented, slightly anxious, and sad, with fair attention, intact memory, and clear speech. (Tr. 410.) During a May 2, 2013, examination, Dr. Ang diagnosed moderate bipolar disorder, after finding plaintiff's Global Assessment of Functioning ("GAF") to be 55,

indicating moderate functional limitations.[3] (Tr. 405, 411.) Dr. Ang noted that plaintiff had had a stable life for 20 years, until the past year after an incident with the police resulted in her being unemployed. (Tr. 405.) Dr. Ang recommended psychotherapy and started plaintiff on Abilify. (Tr. 405, 407.) On May 29, 2013, plaintiff denied side effects from Abilify. (Tr. 406.) On June 25, 2013, Dr. Ang noted that plaintiff had no depressive symptoms, hallucinations, delusions, or suicidal ideations, and that plaintiff was alert and oriented. (Tr. 406.)

On July 29, 2013, plaintiff saw psychiatrist Dr. Pablo Ibanez, who was covering for Dr. Ang. (Tr. 413.) Plaintiff denied suicidal ideations, but reported hearing voices calling her name and seeing shadows. (Tr. 413.) Dr. Ibanez observed that plaintiff was calm, cooperative, and well-groomed, and had fair eye contact, normal speech, depressed mood, irritable affect, logical and coherent thought processes, no paranoia, sustained impulse control, good judgment, and fair insight. (Tr. 413.) Plaintiff denied side effects from her medications, which included Abilify, Cogentin, and Neurontin. (Tr. 414.)

On August 26, 2013, plaintiff reported to Dr. Ang that she no longer had hallucinations. (Tr. 415.) Dr. Ang noted that plaintiff was doing better with the addition of Neurontin and that her sleep and appetite were fair. (Tr. 415.) On examination, plaintiff was cooperative and fairly groomed, with normal speech, euthymic mood and affect, no suicidal ideations, and no paranoia; her memory,

---

[3] GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM") 32, 34 (4th ed. 2000).

attention, impulse control, judgment, insight, and eye contact were all fair. (Tr. 415.) Plaintiff denied medication side effects. (Tr. 415.) Dr. Ang's examination findings remained unchanged in September and October 2013 (aside from an anxious mood noted in October) and plaintiff continued to deny medication side effects. (Tr. 417, 419.)

Dr. Ang submitted a functional assessment dated October 22, 2013. (Tr. 393-400.) He noted that plaintiff reported, <u>inter alia</u>, intense anxiety, anger outbursts, alcohol abuse, and depression. (Tr. 393.) Dr. Ang reported that plaintiff was oriented to time, place, and person and had no delusions or hallucinations; he stated that plaintiff had memory problems, difficulty concentrating, and passive suicidal ideations, persistent anxiety, depressive syndrome, manic syndrome, and bipolar syndrome. (Tr. 394, 396-98.) Dr. Ang stated that plaintiff's condition would likely improve with treatment. (<u>Id.</u>) Dr. Ang opined that plaintiff had marked restrictions in activities of daily living and concentration, but described that these were due to plaintiff's physical pain. (Tr. 399-400.)[4]

Dr. Ang completed a second functional assessment on June 17, 2014. (Tr. 891-96.) He reported similar findings as in his prior assessment, although plaintiff denied suicidal ideations. (Tr. 891.) Dr. Ang rated plaintiff's mental abilities needed to do unskilled work in 25 categories. (Tr. 893-94.) In all categories, Dr. Ang rated plaintiff as able to meet competitive standards (a failure to meet

---

[4] During a November 20, 2013, examination, Dr. Ang recorded findings similar to prior examinations, and he noted that another psychiatrist had told plaintiff to increase her dosage of Abilify, which had caused some daytime tiredness. (Tr. 421.)

competitive standards was defined as having noticeable difficulty from 21 to 40 percent of the workday or week). (Tr. 893-94.) Specifically, Dr. Ang found that plaintiff had very good to unlimited ability to understand, remember, and carry out very short and simple instructions, get along with coworkers, and adhere to basic standards of neatness and cleanliness. (Tr. 894.) Dr. Ang found that plaintiff had was "[l]imited but satisfactory" (defined as having noticeable difficulty no more than 10 percent of the workday or week) in maintaining attention for two hour segments and regular attendance; sustaining an ordinary routine without supervision; working in close proximity to others without being unduly distracted; making simple work-related decisions; responding appropriately to criticism from supervisors and to changes in a routine work setting; dealing with normal work stress; understanding, remembering, and carrying out detailed instructions; maintaining socially appropriate behavior; traveling to unfamiliar places; and using public transportation. (Tr. 893-94.) Dr. Ang opined that Plaintiff was seriously limited (defined as having difficulty from 11 to 20 percent of the workday or week) in completing a normal work week without interruption from psychological symptoms, performing at a consistent pace, and interacting appropriately with the general public. (Tr. 893-94.) Dr. Ang further opined that he anticipated plaintiff would miss more than four days per month because of her impairments. (Tr. 896.)

### 3. Consultative Opinions

SSA consultative examiner Dr. Marilee Mescon conducted an internal medicine examination of plaintiff and issued a report on August 16, 2012. (Tr. 339-45.) Plaintiff complained of back pain since 2009, left knee pain for a few

months, left arm and shoulder pain since being electrocuted in 2009, and asthma since 2002 (for which plaintiff had never been hospitalized and had gone to the emergency room once).  (Tr. 339-41.)  Plaintiff explained that she had never had physical therapy for her left knee nor does she use a brace for either knee.  (Tr. 339.)  At this point in time, plaintiff had not yet received any epidural steroid injections.  Plaintiff, who was right- handed, told Dr. Mescon that despite residual pain in her left shoulder and arm, she could lift up to 15 pounds and could engage in fine manipulation.  (Tr. 339-40.)

On examination, plaintiff was in no acute distress, had a normal gait and stance, and could toe/heel walk and squat fully.  (Tr. 341.)  Plaintiff's musculoskeletal examination was normal.  (Tr. 342.)  She had full ranges of motion of the cervical and lumbar spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally.  (Tr. 342.)  SLR testing was negative bilaterally.  (Tr. 342.)  Her joints were stable and non-tender.  (Tr. 342.)  Plaintiff's thoracic spine was normal.  (Tr. 342.)  The neurological examination was essentially normal.  (Tr. 342.)  Plaintiff had normal deep tendon reflexes and diminished sensory perception over the left median nerve.  (Tr. 342.)  She had 4/5 motor strength in the left arm and left leg, and 5/5 motor strength in the right arm and right leg.  (Tr. 342.)  Plaintiff's extremities were normal.  (Tr. 342.)  Plaintiffs hand and finger dexterity were intact, and she had grip strength of 4/5 in the left hand and 5/5 in the right hand.  (Tr. 342.)  Dr. Mescon diagnosed a history of left knee pain with a torn meniscus, back pain, a history of electrocution injury in the left upper extremity, and asthma.

(Tr. 342-43.)  Dr. Mescon opined that plaintiff had no limitations in her ability to sit or stand, but that her capacity to climb, push, pull, or carry heavy objects could be moderately limited by pain in the left upper extremity.  (Tr. 343.)

SSA consultative examiner David Mahony, Ph.D., a psychologist, also conducted a mental examination of plaintiff and issued a report on August 16, 2012. (Tr. 334-38.)  Plaintiff stated that she was fired from her job as an electrical helper because she was in a vehicular accident with a police car when she took the company car without permission.  (Tr. 334.)  Plaintiff reported that she was not currently receiving psychiatric treatment and has not sought treatment for depression because she doesn't like doctors.  (Tr. 334-35.)

On examination, plaintiff's gait, posture, and motor behavior were normal; her eye contact was appropriate.  (Tr. 336.)  Dr. Mahony observed that plaintiff's mood and affect were depressed and irritable, and her language and sensorium were mildly impaired, her memory skills were impaired, her thought processes were confused, her cognitive functioning was borderline, and her insight and judgment were poor.  (Tr. 336-37.)  He found that plaintiff's attention and concentration were intact and that there was no evidence of hallucinations, delusions, or paranoia.  (Tr. 336.)  Dr. Mahony observed that plaintiff "continually asked the examiner to repeat questions, although when the questions were not repeated she was still able to answer them."  (Tr. 336.)  Dr. Mahony opined that plaintiff could follow and understand simple directions and instructions and perform simple tasks independently.  (Tr. 337.)  However, he reported that she will have severe difficulty

maintaining attention and concentration, maintaining a regular schedule, learning

new tasks, performing complex tasks, making appropriate decisions, relating to

others, and dealing with stress. (Id.) He noted that plaintiff's mental problems

could interfere with her ability to function on a daily basis. (Tr. 337.) Dr. Mahony

stated that plaintiff's prognosis was poor. (Tr. 338.)

4. Expert Opinions

On November 6, 2012, state agency psychologist L. Blackwell, Ph. D.,

provided a mental functional assessment based on his review of the record. (Tr.

118-25.) Dr. Blackwell opined that plaintiff had mild restrictions in daily living

activities and social functioning, moderate difficulties in maintaining concentration,

persistence, or pace, and no episodes of decompensation. (Tr. 118, 122.) He

concluded that plaintiff could perform simple work. (Tr. 123.)

Dr. Malcom Brahms, who is board certified in orthopedic surgery and has

served as a medical expert for the SSA for over 30 years, provided expert testimony

at the June 23, 2014, administrative hearing based on his review of the record. (Tr.

62-97, 217-21.) Dr. Brahms summarized evidence pertaining to plaintiff's

complaints of pain in her low back, left knee, left arm, and left shoulder and her

asthma. (Tr. 64-66.) Dr. Brahms noted that, in his experience, the partial left ACL

tear shown on the August 2012 MRI was of no medical importance in a person of

plaintiff's age and also found that plaintiff's lumbar spinal stenosis shown on the

November 2012 MRI was of no medical significance. (Tr. 78, 80, 82.) Dr. Brahms

testified that no physical examination finding suggested that plaintiff would be

unable to perform light work.  (Tr. 84.)  Accordingly, Dr. Brahms opined that plaintiff could perform light work.  (Tr. 66-67.)

II.    APPLICABLE LEGAL PRINCIPLES

A.    Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."  Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Id. (quoting Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

B.    The Disability Standard

The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in [Appendix 1].  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step.  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C.    Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review.  The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence.  When these two conditions are met, the Commissioner's decision is final.  See

Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."). The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."

(citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

Finally, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)) (internal quotation mark omitted); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed his demeanor." (citations omitted)). An ALJ's decision on credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Soc. Sec. Ruling 96–7p, 61 Fed. Reg. 34484.

D.    The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess, 537 F.3d at 128. An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i)

the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." <u>Halloran</u>, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." <u>Id.</u> at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is not given "any special significance." 20 C.F.R. § 416.927(d)(3); <u>see also</u> Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *3 (July 2, 1996); <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999). When a finding is reserved to the Commissioner, "the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." <u>Snell</u>, 177 F.3d at 133. It is the ALJ's duty, as the trier of fact, to resolve conflicting medical evidence. <u>See</u> <u>Richardson</u>, 402 U.S. at 399.

E.     The ALJ's Duty to Develop the Record

Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," "the ALJ generally has an affirmative obligation to develop the administrative record." <u>Burgess</u>, 537 F.3d at 128 (citations and internal quotation marks omitted). SSA regulations require an ALJ to "inquire fully into the matters at issue and . . . receive in evidence the testimony of witnesses

18

and any documents which are relevant and material to such matters." Id. (quoting 20 C.F.R. § 702.338). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Id. at 129 (citation omitted); see also Calzada v. Asture, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing Perez, 77 F.3d at 47)).

## III. DISCUSSION

Plaintiff argues that "the administrative law judge erred where he concluded that Ms. Infanzon retained the capacity for light work." (Plaintiff's Memorandum in Support of Her Motion for Judgment on the Pleadings ("Pl.s' Mem. in Supp."), ECF No. 17, at 1.) Specifically, plaintiff argues that she lacks the capacity for light work,[5] that Dr. Braham's testimony should have been given no weight, and that the ALJ's mental residual functional determination is not supported by substantial evidence. In contrast, defendant argues that the ALJ's decision is legally correct and supported by substantial evidence. For the reasons discussed below, this court agrees with defendant.

---

[5] Light work involves lifting no more than 20 pounds, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6 (January 1, 1983). It requires either non-continuous walking or standing for a total of approximately six hours in an eight-hour workday with sitting occurring intermittently, or sitting most of the time with some pushing and pulling of arm or leg controls. SSR 83-10, 1983 WL 31251, at *5-6.

A.    The ALJ's Decision

The ALJ evaluated plaintiff's claim pursuant to the five-step sequential

evaluation process and concluded that plaintiff was not disabled within the

meaning of the Act between June 4, 2012, and September 5, 2014, the date of his

decision.

At step one, the ALJ found that plaintiff had not engaged in substantial

gainful activity since June 4, 2012, the alleged onset date.  (Tr. 35.)  At step two, he

determined that plaintiff had severe impairments consisting of the residual effects

of a torn meniscus in the left knee, back pain, asthma, and a bi-polar disorder.  (Id.)

The ALJ determined at step three that none of plaintiff's impairments, nor any

combination of those impairments, was of a severity to meet or medically equal one

of the listed impairments in Appendix 1 of the regulations.[6]  (Tr. 36-37.)

Before proceeding to step four, the ALJ determined that plaintiff had the

residual functional capacity to perform "light work" as defined in the regulations,

except that she is further limited to jobs that do not require her to follow anything

more complicated than simple instructions and tasks.  (Tr. 37.)  The ALJ noted that

for such jobs, plaintiff "is able to understand instructions and carry out tasks,

maintain concentration and attention, get along with coworkers, supervisors and

the public, and keep a regular schedule, all within normal work expectations."  (Id.)

In making this finding, the ALJ considered plaintiff's symptoms, objective medical

evidence and other evidence, as well as opinion evidence.  Based on plaintiff's

[6] Plaintiff does not challenge the ALJ's determinations at steps 1-3.

residual functional capacity, the ALJ concluded at step four that plaintiff had been unable to perform any past relevant work. (Tr. 41.)

At the fifth and final step of the sequential analysis, based on his review of the entire record—and in particular, the testimony of a vocational expert—the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have perform," such as assembler of small products and cashier. (Tr. 41-42.)[7]

As noted above, plaintiff argues that she lacks the capacity to perform light work, that Dr. Brahm's testimony should have been given no weight, and that the ALJ's determination of plaintiff's residual functional capacity is not supported by substantial evidence. This Court concludes, however, that the ALJ's determination of plaintiff's residual functional capacity is supported by substantial evidence and that the ALJ did not commit any legal errors in finding that plaintiff was not disabled within the meaning of the Act.

### 1. Plaintiff's Physical Impairments

Regarding plaintiff's physical impairments, the ALJ first discussed Dr. Mescon's August 16, 2012, consultative examination and opinion that plaintiff can sit and stand without limitation. (Tr. 38.) The ALJ correctly noted that Dr. Mescon opined that plaintiff had no limitations in her ability to sit or stand. Furthermore,

_____

[7] Plaintiff also does not argue that the ALJ failed to meet his burden at step five; rather, plaintiff challenges the ALJ's residual functional capacity determination, which was subsequently used at steps four and five. The Court finds that the ALJ properly utilized the assistance of a vocational expert, satisfying the Commissioner's burden at step five. See Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986).

as also noted by the ALJ, Dr. Mescon's opinion that plaintiff may have moderate limitations in carrying heavy objections is consistent with his finding that plaintiff can do light work. (Id.) See Lewis v. Colvin, 548 F. App'x 675, 677 (2d Cir. 2013) ("As a preliminary matter, the ALJ's determination that Lewis could perform 'light work' is supported by Dr. Datta's assessment of 'mild limitations for prolonged sitting, standing, and walking,' and direction that Lewis should avoid 'heavy lifting, and carrying.'").

The ALJ next described that the MRI of plaintiff's left knee taken four days later on August 20, 2012, revealed no abnormalities. (Tr. 38.) The ALJ acknowledged that an MRI administered on November 6, 2012, showed bulging discs at the L2-3, L3-4, and L4-5, but he noted that the MRI revealed no herniations. (Id.) In his decision, the ALJ relied heavily on Dr. Brahms's opinion, which he gave great weight. The ALJ found that Dr. Brahms was a duly qualified and impartial orthopedic medical expert who thoroughly reviewed plaintiff's file. (Tr. 39.) The ALJ explained that Dr. Brahms testified that plaintiff had a normal gait, normal strength, no stenosis, and normal range of motion and that the objective medical evidence did not provide any reason why plaintiff would physically be unable to perform light exertional work. (Id.) Dr. Brahms's opinion, the ALJ explained, was based on the entire record and supported by cogent and convincing reasons in accord with Dr. Mescon's internal medicine consultative examination and the weight of the record evidence. Thus, the ALJ gave it great weight. (Id.)

Plaintiff argues that Dr. Brahms's opinion should have been given no weight. (Pl.'s Mem. in Supp. at 21.) Specifically, plaintiff argues that "his testimony was not competent and [plaintiff] ask[s] the Court to discard his testimony for the reasons set forth at the hearing." (Id.)

At the hearing, plaintiff's counsel objected to Dr. Brahms's testimony on the basis that his medical license limited him to reviewing files and giving testimony at Social Security hearings and that he no longer otherwise actively practiced medicine. (Tr. 62-64.) Plaintiff's counsel questioned Dr. Brahms about a consent agreement that he entered into with the Ohio medical board in April 2008 that restricted his license to SSA disability review. (Tr. 69-75, 222, 301-05.) In response to counsel's question, "have you ever misrepresented to the Medical Board of Ohio the fact that there were lawsuits against you," Dr. Brahms responded that "[t]here were never any lawsuits against me that were—that pertained to any malpractice." (Tr. 73.) In a June 26, 2014 letter, plaintiff's counsel requested that Dr. Brahms's testimony be given no weight and that he be investigated for perjury on the basis that plaintiff's counsel believed that Dr. Brahms inaccurately testified that he had never been a defendant in a malpractice action, based on Paragraph H of the consent agreement. (Tr. 299.) Paragraph H of the consent agreement states:

> Dr. Brahms admits that, on his Application, he answered "no" to question 17, which reads as follows: "Have you been a defendant in a legal action involving professional liability (malpractice), or had a professional liability claim paid on your behalf, or paid such a claim yourself?" Dr. Brahms admits that he has been named a defendant in one or more legal actions.

(Tr. 302.)

The Court concludes that the ALJ did not err in giving great weight to Dr. Brahms's testimony. As explained above, it is the function of the Commissioner, not the Court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses. Aponte, 728 F.2d at 591 (quoting Carroll, 705 F.2d at 642. The ALJ here provided sufficient specific reasons for finding Dr. Brahms credible—the ALJ concluded that the rationales Dr. Brahms gave for his conclusions were cogent and convincing, and the ALJ noted that Dr. Brahms testimony was consistent with the consultative examination by Dr. Mescon and the weight of the record as a whole. (Tr. 39.)[8]

For example, the records of plaintiff's own treating providers supports Dr. Brahms's conclusions and the ALJ's residual functional capacity determination. Plaintiff admitted to Dr. Wollowick that sitting alleviated her back pain. (Tr. 470.) And by March 2013, plaintiff reported that she had experienced significant pain relief from the lumbar steroid injections she received and plaintiff further reported that she experienced only occasional and mild pain with exertion. (Tr. 440, 442, 44). With respect to plaintiff's left knee impairment, the August 2012 left knee MRI revealed no meniscus tear. (Tr. 346, 351.) Later in the same month, plaintiff reported that her knee had started to feel better. (Tr. 476.) In October 2012, plaintiff admitted to Dr. Gonzalez that her ability to walk was not limited, and Dr.

---

[8] It is unclear from Paragraph H of the consent agreement whether Dr. Brahms admitted that he had been a defendant in a malpractice action. The Court thus cannot determine whether Dr. Brahms provided inaccurate testimony on this point before the ALJ in this case. In all events, even if Dr. Brahms did provide inaccurate testimony on this point, the ALJ's determination to give Dr. Brahms testimony great weight, for the reasons discussed above, was not necessarily improper.

Gonzalez observed that plaintiff ambulated without assistance, had a normal tandem gait, and a normal range of motion.  (Tr. 473-75.)[9]

Furthermore, plaintiff's contention that Dr. Brahms should be discredited because his medical license is limited to reviewing files and giving testimony at Social Security hearings (see Pl.'s Mem. in Supp. at 21-22) is without merit.  "The fact that the State Medical Board of Ohio disallowed Dr. Brahms from practicing medicine with patients, does not necessarily mean that he is ill-equipped to review medical records and provide testimony regarding a disability diagnosis within the meaning of the Social Security Act."  Williams v. Commissioner of Social Security, Case No. 15-cv-7526, 2017 WL 1483545, at * 4; see id. (rejecting similar challenge to Dr. Brahm's credibility).

In short, the ALJ did not improperly rely on Dr. Brahms's opinion and substantial evidence in the record concerning plaintiff's physical impairments supports the ALJ's residual functional capacity determination.

## 2. Plaintiff's Mental Impairments

Plaintiff also challenges the aspects of the ALJ's residual functional capacity determination that relate to her mental impairments.  As noted, the ALJ found that plaintiff remained capable of following simple instructions and tasks and concluded that plaintiff remained able to maintain attention and concentration, get along with

---

[9] Plaintiff does not argue that any physical impairments concerning her shoulder render her unable to perform light work, as described by the ALJ.  Any such argument is therefore waived.  In any event, Dr. Gonzalez noted that plaintiff was in no acute distress and had intact rotator cuff strength. (Tr. 474.)  Plaintiff also denied shoulder pain or a limited range of motion during a January 28, 2013, examination with Dr. Kosharskyy.  (Tr. 449.)

co-workers, supervisors, and the public supervisors and the public, and keep a regular schedule, all within normal work expectations. The Court concludes that this determination was supported by substantial evidence.

In a functional report dated July 9, 2012, plaintiff stated that she could follow both spoken and written instructions. (Tr.262-63.) Plaintiff was able to care for her personal needs and for her dog. (Tr. 256-57, 340.) As noted by the ALJ, plaintiff also kept her appointments, indicating some ability to keep a regular schedule. (Tr. 40.) The ALJ explained that there was nothing in plaintiff's treatment notes that indicated she was unable to understand and carry out simple instructions. (Id.)

The records and opinions from plaintiff's treating psychiatrist, Dr. Ang, support the ALJ's residual functional capacity. As the ALJ explained, Dr. Ang noted that plaintiff could remember work-like procedures, understand and maintain attention for two hour segments, maintain regular attendance, and be punctual within normal limits. (Tr. 40 (citing Tr. 893).) Throughout plaintiff's treatment with Dr. Ang, Dr. Ang recorded benign examination findings and a GAF of 55, signifying only moderate functional limitations. (Tr. 405-06, 408, 410-11, 413-15, 417-19, 421, 913-14.) Furthermore, Dr. Ang's June 17, 2014, opinion rating plaintiff's mental abilities in 25 categories supports the ALJ's findings, as Dr. Ang found that plaintiff was able to meet competitive work standards in all categories, including the areas of following simple instructions and tasks, maintain attention

and concentration, keeping a regular schedule, and getting along with others.  (Tr. 37, 39-40, 893-94.)

Plaintiff takes issue with several aspects of the ALJ's characterization and reliance on these portions of Dr. Ang's testimony.  First, plaintiff sates that "Dr. Ang opined that Ms. Infanzon experience 'marked' limitations in activities of daily living due to back and body pain."  (Pl.'s Mem. in Supp. at 24.)  This is true. Critically, however, Dr. Ang was plaintiff's treating psychiatrist and was not qualified to opine on plaintiff's physical impairments.  Plaintiff also notes that Dr. Ang opined that plaintiff suffered from "marked" limitations in other areas, such as social functioning, concentration, and daily living and that plaintiff was "seriously limited" in her ability to complete a normal workday.  (Pl.'s Mem. in Supp. at 17 (citing Tr. 399, 893).)  Even though plaintiff was "seriously limited" in these areas, she still met competitive standards, as noted by the ALJ.  (Tr. 40; see Tr. 893.) Moreover, it was appropriate for the ALJ to adopt portions of Dr. Ang's opinion that were supported by substantial evidence, while not relying on those portions that were not.  See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (finding that the ALJ properly credited only a portion of the treating physician's opinion and that it "was within the province of the ALJ to resolve that evidence in the way she did").

To the extent plaintiff argues that the ALJ did not follow the treating physician rule in not according certain of Dr. Ang's opinions controlling weight, this contention is without merit.  A treating source's opinion as to the ultimate conclusion of whether a claiming is disabled "cannot itself be determinative."  Snell

v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Here, the ALJ considered the totality of the evidence and made a contrary determination to certain of Dr. Ang's opinions that, as discussed above, he concluded were not supported by the record evidence. "The opinion of a treating physician is not binding if it is contradicted by substantial evidence." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983.) In reaching his determination, the ALJ did not improperly rely on his own opinions but rather properly relied on the other evidence in the record.

In support of his conclusion, the ALJ also explained that he gave the opinions of non-examining consultant Dr. Blackwell good weight. Based on his review of the record, Dr. Blackwell opined that even though plaintiff had mild restrictions in daily living activities and social functioning, moderate difficulties in maintaining concentration, persistence, or pace, she could nonetheless perform simple work. (Tr. 123.) The ALJ noted that this opinion was in accord with the weight of the evidence. (Tr. 40.) The ALJ explained that he chose not to give Dr. Mahoney's opinion significant weight because it was based on a one-time evaluation and the severe problems found by Dr. Mahoney were not supported by the psychiatric treating notes, which documented plaintiff over a longer period of time. (Tr. 39.) The ALJ did not err in reaching this conclusion, as "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." Veino, 312 F.3d at 588 (citing Richardson v. Perales, 402 U.S. 389, 399 (1977)).[10]

---

[10] Plaintiff does not appear to specifically challenge the ALJ's determination that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms was not entirely credible. As the Court has already discussed, it is well within the ALJ's discretion to evaluate a plaintiff's credibility and render an independent judgment in light of the medical findings

In short, the Court finds that the ALJ's residual functional determination was supported by substantial evidence and the ALJ applied the correct legal standards in reaching his conclusion that plaintiff was not disabled. The Court must uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston, 904 F.2d at 126; DeChirico, 134 F.3d at 1182-83.

IV.     CONCLUSION

For the reasons discussed above, defendant's motion for judgment on the pleadings is GRANTED and plaintiff's cross-motion for judgment on the pleadings is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 13 and 16 and to terminate the action.

SO ORDERED.

Dated:          New York, New York
                August 17, 2017

_____
                KATHERINE B. FORREST
                United States District Judge

---

and other evidence. See Snell, 177 F.3d at 135. For the reasons discussed by the Court, the ALJ's findings are supported by substantial evidence, and the Court must uphold the ALJ's decision to discount plaintiff's subjective complaints. See Aponte, 728 F.2d at 591.